**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**HILBERT S.,[1] in his own right**
**and as legal guardian pursuant to Order**
**of Tioga County Family Court of E. DOE, JR.,**
**A. ROE, D. ROE, H. ROE, and C. ROE, and**
**pursuant to Order of Chemung County Family**
**Court of A. DOE, all infants under the**
**age of 14,**

                                        **Plaintiffs,**

        **-against-**                                                **3:03-CV-193**


**COUNTY OF TIOGA, TIOGA COUNTY DEPARTMENT**
**OF SOCIAL SERVICES, CHILD PROTECTIVE**
**SERVICES UNIT OF THE TIOGA COUNTY**
**DEPARTMENT OF SOCIAL SERVICES, CHRISTINE**
**WALKER, and WILLIAM SHELLEY,**

                                        **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

## I.  INTRODUCTION

        Plaintiff Hilbert S. commenced this action on behalf of himself and certain minor children

_____

[1] Although Plaintiffs complied with N.D.N.Y.L.R. 8.1 and used pseudonyms in place of the children's names, the Complaint and other documents submitted in this action contain identifying information that is barred by Rule 8, such as the children's dates of birth and social security numbers. The Court has refrained from using this information in this Decision and Order.  Further, the Court has avoided using the last names of the children's legal guardian, the children's mother, the mother's paramour, and the children's father, as well as the specific dates of the Family Court orders granting Hilbert S. custody, so as to avoid information that might serve to identify the children.

for whom he has been granted legal custody and guardianship, Compl. ¶¶ 2-6,[2] asserting claims

against the County of Tioga, New York ("the County"); its Department of Social Services ("DSS");

the Department of Social Services' Child Protective Unit ("CPU"); and two DSS employees -

Christine Walker ("Walker") and William Shelley ("Shelley").[3]   The Complaint, which is forty-

eight (48) pages long and contains one-hundred and twenty-four (124) paragraphs, asserts claims

arising from what Hilbert S. considers was the failure by Defendants to properly investigate and take

remedial action during numerous child abuse/neglect investigations involving the children from

1997 until 2002 when the children were all finally placed in Hilbert S.'s custody. Id. ¶¶ 12, 16-55.

Plaintiffs assert claims under 42 U.S.C. § 1983 contending: (1) that Defendants Walker and

Shelley's actions and/or deliberate indifference to the children's well being violated Plaintiffs'

substantive due process rights (First Cause of Action, Compl. ¶¶ 56-64); (2) that the County, DSS,

and CPU maintained a policy or practice that caused the Plaintiffs to suffer substantive due process

violations (Second Cause of Action, Compl. ¶¶ 65-76); (3) that Walker and Shelley's actions and/or

deliberate indifference, and the County, DSS, and CPU's policy and/or practice caused the Plaintiffs

to suffer violations of their procedural due process rights (Third Cause of Action, Compl. ¶¶ 77-84);

and (4) that Defendants' actions, deliberate indifference, policy and/or practice deprived Plaintiffs of

their rights secured under the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 et seq.

("CAPTA")(Fourth Cause of Action, Compl. ¶¶ 85-93). Plaintiffs also bring supplemental state law

claims asserting: (1) that Defendants breached their statutory duty "to report suspected incidents or

---

[2] The children reside with Hilbert S. and his wife, who is the maternal grandmother of the children. Compl. at ¶ 4. Hilbert S. characterizes himself as the "step-grandfather and legal guardian of the infant plaintiffs." Id. at ¶ 2.

[3] Shelley is no longer employed by DSS, but that fact is irrelevant for purposes of this motion.

conditions of sexual abuse, maltreatment and/or neglect involving" the infant plaintiffs, and therefore are liable under New York Social Services Law § 420 (Fifth Cause of Action, Compl. ¶¶ 94-98); (2) that Defendants performed their duties negligently thereby causing the Plaintiffs to suffer injury (Sixth Cause of Action, Compl. ¶¶ 99-107); (3) the County, DSS, and CPU were negligent in their hiring, training, supervision and discipline of its employees, and such negligence caused plaintiffs to suffer injury (Seventh Cause of Action, Compl. ¶¶ 108-111); (4) the Defendants committed professional malpractice (Eighth Cause of Action, Compl. ¶¶ 112-118); and (5) Walker and Shelley's conduct constituted the intentional and/or negligent infliction of emotional distress (Ninth Cause of Action, Compl. ¶¶ 119-124). Plaintiffs seek only monetary damages. Compl. ¶¶ 1, 64, 76, 98, 107, 111, 118, 124.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, that motion is granted.

## II. BACKGROUND/FACTS

On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-movant, and draws all reasonable inferences in that party's favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). Doing so in this case reveals a history in which there were numerous reports made under New York's child neglect and abuse reporting procedures regarding the infant plaintiffs. See N.Y. Soc. Serv. Law § 422.[4] These reports, made at various times from 1997 until 2001, raised concerns that the children were being abused and/or neglected by their mother, "Aimee D." and/or by their mother's paramour, "Roland K." Compare Def. Local Rule 7.1

---

[4] New York Social Service Law § 422 establishes a statewide "central register" to receive telephone calls of child abuse and maltreatment. The statewide central register is staffed twenty four hours a day, seven days per week and is colloquially referred to as the "Child Abuse Hotline."

3

Stat. ¶¶ 14-31 with Plf. Local Rule 7.1 Stat. ¶¶ 14-31.[5]  In accordance with the protocols of New York's child abuse and maltreatment reporting system, see N.Y. Soc. Serv. L. § 422, these reports were channeled to the Tioga County DSS and investigated by either Walker or Shelley.

The results of the investigations are set forth with great detail in the Plaintiffs' papers and addressed more fully below. Suffice it to say that, when viewed in the light most favorable to Plaintiffs, the various investigations yielded evidence that the infant plaintiffs were being neglected and/or abused by Aimee D. and Roland K. The record further reveals numerous instances where DSS personnel failed to follow required reporting procedures or deadlines, and the benefit of hindsight reveals that a more thorough investigation probably could have yielded more evidence of the neglect and abuse that the children endured in their home.[6] DSS took certain actions related to the findings of their investigations, but the actions did not stop the abuse and neglect that the children suffered. Drawing reasonable inferences in Plaintiffs' favor, it could fairly be concluded that the abuse to the children would have continued had Aimee D. and Roland K. not been arrested on various state and federal criminal charges related to their conduct toward the children, and the custody of the children transferred to Hilbert S. in 2002. This action, and the instant motion, followed.

---

[5]From 1997 to 2001, at least twelve Hotline reports were filed and investigated, involving repeated accounts or concerns of sexual abuse, educational neglect, unsanitary conditions, inadequate guardianship, and physical abuse of the children in Aimee D.'s home. Four of these were "indicated" under New York law, three for sexual abuse against Roland K. and two for sexual abuse against Aimee D. There were also previous Hotline reports involving Aimee D.'s children with her first husband, Eric D., dating back to 1993. See Plf. 7.1 Stat. ¶ 14; Walker Aff. ¶ 5.

[6] On this motion, Plaintiffs offer the affidavit of a social worker, Velma B. Campbell, who opines that the lack of appropriate casework oversight, staff shortages within DSS and CPU, caseworkers' failure to follow accepted investigative protocols and timetables, and the known personal problems of the caseworkers "increased the vulnerability of the plaintiff children." Campbell Aff. ¶ 27.  Viewing the evidence in the light most favorable to Plaintiffs, a reasonable fact finder could conclude that both Walker and Shelley had problems with alcohol that impacted their overall job performance, and that DSS was aware of these problems. There is no evidence, however, that directly links any particular decision, action, or omission by Walker or Shelley with the use of alcohol.

### III.    STANDARD OF REVIEW

The Court will apply the well settled standard for summary judgment as defined by statute,

see FED. R. CIV. P. 56(c), case law,  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986), and this Court's Local Rules. See N.D.N.Y.L.R. 7.1

### IV.  DISCUSSION

#### A. Substantive Due Process Claims

_____Defendants argue that the substantive due process claims asserted in the First and Second

Causes of Action are barred by DeShaney v. Winnebago County Dept. of Social Serv., 489 U.S. 189

(1989), because Defendants did not take the children into custody or otherwise place them in a

worse position then they were found in, and because the injuries suffered by the children were

inflicted by private actors.  Plaintiffs counter that an exception to DeShaney applies in this case.

In DeShaney, the Supreme Court rejected the plaintiffs' claim that DSS's failure to remove

the children from an apparently abusive household constituted a violation of substantive due

process, noting that the due process clause was intended as a limitation on the state's power to act,

"not as a guarantee of certain minimal levels of safety and security." DeShaney, 489 U.S. at 195.

The Court held that "[n]othing in the language of the Due Process Clause itself requires the state to

protect the life, liberty, and property of its citizens against invasion by private actors." Id.  The Court

reasoned that "[i]f the Due Process Clause does not require the State to provide its citizens with

particular protective services, it follows that the State cannot be held liable under the Clause for

injuries that could have been averted had it chosen to provide them." Id. at 196-7.  Thus, the Court

concluded that "[a]s a general matter ... a State's failure to protect an individual against private

5

violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

There are, however, two judicially recognized exceptions to the Deshaney rule - the "special-relationship" theory, and the "state created danger" theory. See Citizen's Accord, Inc. v. Town of Rochester, 2000 WL 504132, at *18-*24 (N.D.N.Y. April 18, 2000)(McAvoy, J.)(discussing both exceptions).  Plaintiffs assert that the state created danger exception applies because DSS  workers, and the DSS as a whole, acted in a manner that increased the children's vulnerability.[7]

The state created danger exception, first articulated by the Second Circuit in the police context in Dwares v. City of New York, 985 F.2d 94 (2d Cir. 1993), essentially holds that a state actor can be held liable for a substantive due process violation when the state actor takes some affirmative step that "assisted in creating or increasing the danger to the victim." Dwares, 985 F.2d at 98-99; see Citizen's Accord, Inc., 2000 WL 504132, at *20 ("The ... state-created danger theory []

---

[7] In this regard, Plaintiffs contend that Defendants:

willfully disregarded complaints of abuse and used their authority to encourage evasive action on the part of [the children's mother and her paramour] and/or to advocate for [the children's mother and her paramour's] interests over those of the children, thereby encouraging [the children's mother and her paramour] to abuse and neglect the children, depriving the children of ordinary channels of complaint, and increasing the children's vulnerability to, and injury from, continuing, renewed, and exacerbated abuse.
                    * * *

[I]ndicated reports of sexual abuse were filed in 1997, 2000 and 2001; yet the agency and its caseworkers permitted the perpetrators to determine whether further protective or preventative services and supervision would be acceptable or even offered. Plaintiff's proof suggests not only that caseworkers had social ties with the perpetrators which biased their investigations, but the agency decision-makers who conferenced [sic] the casework report and determinations failed to adhere to basic agency standards in the conduct of interviews, investigations, and case reviews. The proof also indicates that agency performance standards pushed caseworkers, supervisors, and management alike to make decisions that would enhance agency reports of compliance with state standards without regard to the basic safety needs of the children or the impact of agency decisions on the children's vulnerability or the perpetrators' future conduct.

Plf. Mem. L. pp. 4-5.

comes into play where a state actor creates the danger or increases the victim's vulnerability to the danger.")(citing DeShaney, 109 S.Ct. at 1006; Dwares, 985 F.2d at 99); Brown v. Commonwealth of Pa. Dept. of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 478 (3rd Cir. 2003)("This 'state-created danger' exception applies when the state, through some affirmative conduct, places the individual in a position of danger.")(citing Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998)).

While "the boundaries of the state created danger exception to DeShaney are not entirely clear," Clarke v. Sweeney, 312 F. Supp.2d 277, 293 (D. Conn. 2004); see Brown, 318 F.3d at 479 ("Determining the appropriate lens through which we must view actions in the state-created danger context, though, is a vexing problem."), there are a number of common elements that the various courts have adopted. See Ruiz v. McDonnell, 299 F.3d 1173, 1182-83 (10th Cir. 2002)(listing elements); Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996)(listing elements); Citizen's Accord, Inc., 2000 WL 504132, at *18-*24 (discussing the common elements of this exception).

First, the actor must have acted affirmatively, using his or her authority to create an opportunity that would not otherwise have existed for the third party's acts to occur. Citizen's Accord, Inc., 2000 WL 504132, at *21; see Brown, 318 F.3d at 478; Ruiz, 299 F.3d at 1183; Mark v. Borough of Hatboro, 51 F.3d 1137, 1152 (3d Cir. 1995). Second, there must be evidence that the state actor had culpable knowledge of the danger in which he or she was placing the victim. Citizen's Accord, Inc., 2000 WL 504132, at *21 (citations omitted); Ruiz, 299 F.3d at 1182-83; Kneipp, 95 F.3d at 1208. Because such a claim is brought under Section 1983, the state actor must have displayed at least deliberate indifference to a known or obvious danger. Brown, 318 F.3d at 479; Kneipp, 95 F.3d at 1208; Piotrowski v. City of Houston, 237 F.3d 567, 584 (5th Cir. 2001).

"The Supreme Court has specifically pointed out that the Due Process Clause is not implicated by an official's negligent act. ...  Indefensible passivity and nonfeasance do not rise to the level of a constitutional violation." <u>Brown</u>, 318 F.3d at 479 (citing, <u>inter alia</u>, <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986)).

Third, there must be evidence that the state actor's conduct caused the injury to the victim, or contributed to it in some material way. <u>Clarke</u>, 312 F. Supp.2d at 293; <u>Ruiz</u>, 299 F.3d at 1182-83. Fourth, there must be evidence that the state actor's conduct was so egregious or outrageous that it is conscience-shocking. <u>Burton v. Richmond</u>, 370 F.3d 723, 729 (8th Cir. 2004); <u>Ruiz</u>, 299 F.3d at 1182-83; <u>but see</u> <u>Brown</u>, 318 F.3d at 479-80 (concluding that the "conscience-shocking" standard applies only in cases where state actors must "act with urgency.").

## 1. Shelley and the Municipal Defendants

Plaintiffs have not offered sufficient evidence to bring the substantive due process claims against Shelley and the municipal defendants (Tioga County, DSS, & CPU) beyond the reaches of <u>DeShaney</u>. First, there is no evidence of affirmative action taken by the municipal defendants or Shelly that could be said to have created a danger that did not already exist, or that increased the children's vulnerability to the already present danger posed by their mother and her paramour.  At most, the claims against Shelley and the municipal defendants are founded upon the premise that these defendants did not do enough to ferret out and stop the abuse that was occurring in the household.  While the evidence, taken in the light most favorable to Plaintiffs, reveals that these defendants could have done more and did not follow all of the requirements for investigation and timely reporting, the claims against them amount to nothing more than claims of negligence or nonfeasance.  There were no affirmative acts by these defendants that served to increase the

8

children's vulnerability to the already present danger from their mother and her paramour. See Forrester v. Bass, 397 F.3d 1047, 1058 (8th Cir. 2005)(The filing of a false family assessment report and other acts by DSS employees "were not affirmative acts of endangerment, which 'created greater risks to [the []] children] than the ones to which [they were] originally exposed.' Instead, ... the state action here was effectively 'the same as if [the state] had done nothing.'")(quoting S.S. v. Mullen, 225 F.3d 960, 963 (8th Cir. 2000)(en banc)).

A court must be careful to avoid transposing allegations of negligence and nonfeasance into affirmative action. To do so would, in practice, overturn DeShaney. Certainly, in this case, and in many others, it could be argued with compelling force that if the state actors had only done something more, the injury would not have occurred and, therefore, the state actor enabled the victimizer. But the difference between standing back and doing nothing, see DeShaney, 489 U.S. at 20 ("The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."), and assisting "in *creating or increasing the danger* to the victim," Dwares, 985 F.2d at 99 (emphasis added), although subtle, is nevertheless distinguishable. Here, as in DeShaney, it can only be concluded that these state actors did not do enough, but, by the same token, did nothing that increased the children's vulnerability. These defendants did not increase the children's vulnerability to future abuse by doing their jobs poorly. See DeShaney, 489 U.S. at 201.[8] The lack of affirmative action

---

[8] In DeShaney, the state once had taken temporary custody of the child but then returned him to his father; even so, the Supreme Court reasoned:

> [W]hen [the State] returned [the boy] to his father's custody, [the State] placed him in no worse position than that in which he would have been had [the State] not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the boy].

(continued...)

9

that increased the children's danger is, in itself, fatal to the substantive due process claims against these defendants. See Rose v. Zillioux, 2001 WL 1708796, at * 7 (N.D.N.Y. Dec. 27, 2001)("Plaintiff's reliance upon the 'state-created danger' theory fails because she has not proffered any evidence to demonstrate that Defendants took any action that rendered her more vulnerable to illicit sexual conduct.").

Second, the Court cannot fairly say that the inactions or nonfeasance of these defendants caused or contributed to the injuries suffered by the children at the hands of their mother and her paramour. The most Plaintiffs offer on this point is the mere speculation that, if something different had been done, the abuse to the children might have been stopped sooner. See Campbell Aff. ¶ 10 ("Had preventive services been introduced [earlier], it is *probable* that the sexual abuse and emotion trauma for the [subject] children *could have* been avoided.")(emphasis added); ¶ 25 ("A policy of supervisory review ... *might have* highlighted a pattern of casework deficiencies and provided insight into the casework direction needed ... before a pattern of escalating abuse emerged.")(emphasis added). Third, even if it could be concluded that these defendants took affirmative action that caused the children to suffer injury, the actions could not be deemed conscience-shocking official action. See Forrester, 397 F.3d at 1058.[9]

_____

[8](...continued)
489 U.S. at 201.

[9] In a similar situation in which plaintiffs raised the "state created danger" exception, the Eighth Circuit wrote in Forrester:

Even if Forrester could establish a sufficient causal connection between state action and the ensuing private acts of violence, his substantive due process claims still must fail because Forrester cannot demonstrate the requisite degree of offensive conduct or deliberate disregard by Johnson and Rosa necessary to establish substantive due process violations. "Before official conduct or inaction rises to the level of a substantive due process violation[,] it must be so egregious or outrageous that it is conscience-shocking." Burton, 370 F.3d at 729. The dreadful abuse suffered by the Bass children was

(continued...)

10

For these reasons, the substantive due process claims against Shelley, the County, DSS, and CPU fail as a matter of law. Accordingly, the substantive due process claims against these defendants are dismissed.

## 2.  Walker

The substantive due process claim against Walker, however, requires a more in-depth review of this defendant's involvement with the DSS investigation of the children's household.

Through prior DSS investigations involving Aimee D., it could fairly be said that Walker knew of Aimee D.'s difficulty in properly caring for her children. See Walker Aff. ¶ 4 ("I found four indicated reports involving [Aimee D.] ... during the 1993 time frame. There were five unfounded reports.").  There is also some indication in the record that Walker felt that Hilbert S. was not an impartial reporter of Aimee D.'s problems. At some point in time after Roland K. moved in with Aimee D. and the children, Hilbert S. called DSS directly and spoke to Walker about concerns he had related to the care of the children. Walker told him "to keep out of it, that [he] was just a meddlesome grandparent." Hilbert S. Aff. ¶ 9.

In April of 1997, one of the children, A. Doe, was placed in the custody of Hilbert S. with Aimee D.'s consent. Plf. 7.1 Stat. ¶ 14. After A. Doe was in Hilbert S.'s care, he told Hilbert S. that Roland K. had sexually abused him and his brother, E. Doe, Jr. Id. ¶ 14.  Hilbert S. brought A. Doe

---

[9](...continued)

egregious. But private parties, not state actors, inflicted the severe physical abuse that killed Larry and Gary.

While we do not condone any official negligence contributing to this tragic case, we conclude [the DSS workers] did not engage in official conduct so egregious or outrageous as to shock the contemporary conscience. See County of Sacramento v. Lewis, 523 U.S. 833, 848 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

Forrester, 397 F.3d at 1058.

to his doctor, and, on October 10, 1997, the doctor made a Hotline call that was ultimately channeled to the Tioga County DSS and assigned to Walker. Plt. 7.1 Stat. ¶¶ 14-15; Campbell Aff., ¶ 6. After an investigation that is highly criticized by Plaintiffs, see Plt. 7.1 Stat. ¶¶ 14-17; Campbell Aff. ¶ 6; Hilbert S. Aff, ¶¶ 14-18, Walker determined to "indicate" the report but to "close" it (i.e. take no further action or offer any further remedial services) because the child who made the allegation, A. Doe, was living "in a safe place." Hilbert S. Aff, ¶ 18; see Walker Aff. ¶ 6.  Walker did not recommend any action insofar as E. Doe, Jr. was concerned because she did not feel there was sufficient evidence of danger to E. Doe, Jr. or the other children in the Roland K.-Aimee D. home. Def. 7.1 Stat. ¶ 17; Plt. 7.1 Stat. ¶ 17; Walker Aff. ¶ 6.  When Hilbert S. contacted Walker directly and told her that he believed, based upon what the children had told him, that the other children were in danger of abuse from Roland K., Walker told Hilbert S. that "it was not [his] concern, that [he] should only call if [he] had something concrete to report." Id. at ¶ 19.

Following this, there were five Hotline reports between May 13, 1998 and February 3, 2000 regarding inadequate guardianship, educational neglect, and sexual abuse in the Roland K.-Aimee D. home. All were investigated and deemed "unfounded" by DSS. See Def. 7.1 Stat. ¶¶ 18-22. Plaintiffs have criticized the adequacy of each of these investigations, and have questioned the propriety of determining whether any of these reports should have been marked "unfounded."  Plt. 7.1 Stat. ¶¶ 18-22.  Walker does not appear to have been assigned on any of these investigations. See Walker Aff. ¶ 7.

On September 1, 2000, a report was filed alleging inadequate guardianship and sexual abuse by Roland K. of one of the children. See Def. 7.1 Stat. ¶ 23;  Plt. 7.1 Stat. ¶ 23.  Although Walker was not assigned to the case, she decided to take on the case because she felt the caseworker

12

assigned to the case was not moving quickly enough. <u>See</u> Campbell Aff., ¶ 7.  The report was

"indicated" but "closed" without further action because Aimee D. claimed (1) that Roland K. had

been solely responsible for the children's care while she was at work, (2) that she did not have any

involvement or knowledge of the incident, and (3) that Roland K. was no longer living in the house

and would have no further contact with the children. <u>See</u> Def. 7.1 Stat. ¶¶ 24-25; <u>see</u> Walker Aff. ¶

8. Plaintiffs contend, however, that a simple investigation and/or follow up would have established

that each of Aimee D.'s assertions were untrue. Plf. 7.1 Stat. ¶ 24-25.

On February 9, 2001, there was a report of educational neglect that was deemed unfounded.

Def. 7.1 Stat. ¶ 26.  On April 23, 2001, a report of inadequate guardianship alleging that the

children were not properly restrained in car seats was deemed "indicated" and the case "closed"

upon Aimee D.'s representation that she was taking the vehicle the children were riding in off of the

road. Def. 7.1 Stat. ¶ 27; Plf. 7.1 Stat. ¶ 27.  A report dated May 22, 2001 was filed that alleged that

Aimee D. and Roland K. were locking the children out of the house so they could have sex, and that

Roland K. threw a child against the wall. Def. 7.1 Stat. ¶ 28.  The report was deemed "unfounded."

<u>Id.</u>  A June 5, 2001 report alleged that Aimee D. neglected the children by not adequately

supervising them, not feeding them, not changing their diapers, keeping an unsanitary home, and by

latching them into their rooms at night. Plt. 7.1 Stat. ¶ 30.  This report was also deemed

"unfounded." Def. 7.1 Stat. ¶ 30.  A report dated September 11, 2001 alleging that Aimee D. and

Roland K. were sexually abusing the children was deemed "indicated" but the case was "closed" on

the grounds that Roland K. was no longer living in the home, Def. 7.1 Stat. ¶ 31, and that there was

no physical evidence of abuse by Aimee D. <u>See</u> Campbell Aff. ¶ 9.  The Plaintiffs have criticized

DSS's handling of each these investigations, but there is no indication that Walker was directly

involved in any of these particular investigations either. See Plf. 7.1 Stat. ¶¶ 26-31; Campbell Aff. ¶¶ 8-9.

Based upon the above, there is no reason to differentiate Walker from Shelley or the municipal defendants for purposes of analyzing the substantive due process claim against her. Hence, like with Shelley and municipal defendants, the above-stated facts do not reveal any affirmative conduct by Walker that could fairly be said to have caused or contributed to the children's vulnerability, nor is there any indication of "conscious-shocking" conduct by Walker. However, Plaintiffs argue that Walker and Aimee D. were friends and, Plaintiffs believe, that Walker was tipping Aimee D. off to the investigations so that she could prepare for them, and, possibly, advocating for Aimee D. in the decision making process at DSS. Walker has denied that she ever forewarned Aimee D. of any DSS investigations, and contends that she performed all of her duties related to this family with the "utmost professionalism." Walker Aff. ¶¶ 9-10.

If Plaintiffs were able to establish that Walker did use her position as a DSS caseworker to protect Aimee D. and Roland K. from DSS investigation and, perhaps, prevent removal of the children, then a finder of fact might be able to conclude that Walker acted affirmatively and in way that created an opportunity that would not otherwise have existed for Aimee D. and Roland K. to abuse the children. Further, in light of the fact that Walker indicated reports in October of 1997 and September of 2000 that involved allegations that Roland K. had sexually abused children in Aimee D.'s household, a fact finder could conceivably conclude that Walker's conduct was intended to aid in the concealment of sexual abuse of children in the household and was, therefore, conscious-shocking.  Hence, it might be possible to establish a "state created danger" exception to <u>DeShaney</u>

14

somewhat similar to that recognized in <u>Dwares</u>. See <u>Dwares</u>, 985 F.2d at 99.[10]

However, the facts supporting Plaintiffs' state created danger theory against Walker are insufficient to withstand summary judgment. With regard to a friendship between Walker and Davis, the record reflects that on a few occasions during the five year span that the above-referenced DSS investigations occurred, Walker happened to be at the same bar as Davis. <u>See</u> Walker dep. pp. 55-56. On at least one of these occasions, Walker and Aimee D. conversed briefly when they found themselves side by side at the bar. <u>Id.</u>  While Walker cannot recall whether the discussion concerned DSS's investigations of Davis, Walker does remember that during the same period of time she had at least one conversation with Aimee D. during which Aimee D. complained that Hilbert S. had made various calls to DSS because he was "trying to cause her trouble." <u>Id.</u> at p. 59. Drawing every reasonable inference in Plaintiffs' behalf, a reasonable fact finder could conclude that, on at least one occasion, Walker and Aimee D. discussed a DSS investigation in a social setting.

In support of the theory that Walker was tipping off Aimee D. to DSS investigations, Plaintiffs submit an affidavit from Tacama Donahue.  Donahue ran a hair salon across the street from where Aimee D. resided with the children. Donahue Aff. ¶ 2.  Donahue attests that she found the children's home to be "so filthy and infested with roaches that [she] would not sit on any of the

---

[10] In <u>Dwares</u>, the plaintiff was involved in a flag-burning demonstration when he was beaten by counter-demonstrators.  In vacating the judgment of the District Court that dismissed the claim on a Rule 12(b)(6) motion, the Second Circuit found that the allegations in the complaint

> went well beyond allegations that the defendant [police] officers merely stood by and did nothing ... It alleged that the officers conspired with the 'skinheads' to permit the latter to beat up the flag burners with relative impunity.... It requires no stretch to infer that such prior assurances would have increased the likelihood that the 'skinheads' would assault demonstrators.... Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause.

<u>Dwares</u>, 985 F.2d at 99.

furniture." Id. at ¶ 5(c). In 1998 or 1999, Donahue witnessed Aimee D. passing around nude

pictures of the children that made her uncomfortable and prompted her to make an anonymous call

to DSS. Id. at ¶¶ 5(b) & 6. Donahue called DSS a second time in the summer of 2000 when one of

the children came to her salon and told her that Aimee D. had left the children alone with Roland

K., and that Roland K. was drunk. Id. at ¶ 8. Donahue claims she was told by DSS personnel that

they would send someone right over "to get the children," but before DSS arrived Aimee D. showed

up at the salon, took the child, and left. Id.

Donahue further attests that she often received telephone calls from Hilbert S. and his wife

advising that they had made calls to DSS regarding the children.  Donahue asserts that she "became

aware of a pattern" that "repeated itself for 6 or 8 of the nearly 12 times that [the grandparents] told

me they called DSS." Id. at ¶¶ 10, 11. In this regard, Donahue asserts that after she learned that the

grandparents had called the Hotline, Aimee D. and Roland K. would clean up the house and leave

for a few days with the children. During their absence, DSS personnel would show up at the

residence, knock on the door, wait a short period, look in the windows, and then leave. Id.  Donahue

would then go across the street and look in the windows and "see that the hovel in which [] the

children normally lived was straightened up and somewhat presentable." Id. at ¶ 10(d).  However,

Donahue asserts that Aimee D., Roland K., and the children "would return within a couple days of

the DSS visit and the residence would return, within a couple days, to the pigsty it normally was and

then the cycle would be repeated." Id. at ¶ 10(e).

While this information raises the specter that something was up, it is mere surmise to

conclude that the "pattern" she observed is proof that Walker was tipping off Aimee D.  Such

unsupported speculation is insufficient to create a question of fact in the face of Walker's denial of such conduct. See FED. R. CIV. P. 56(e); Amnesty America v. Town of West Hartford, 361 F.3d 113, 131 & n. 12 (2d Cir. 2004)(district court deciding summary judgment motion is free to disregard those portions of affidavits amounting to "hearsay statements and speculation.")(citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71-72 (2d Cir. 2000)); Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003)(mere speculation and "conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment."); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) (Even where facts are disputed, in order to defeat summary judgment, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation.")(quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

Plaintiffs also point to Donahue's affidavit wherein she asserts that when she spoke to Aimee D. about the DSS investigations, Aimee D. bragged that she "didn't have anything to worry about because she goes out with [Walker]." Donahue Aff. at ¶ 21. Similarly, Hilbert S. attests that Aimee D. bragged to him that she was friends with Walker and that she "had nothing to worry about because [Walker] told her everything about her case." Hilbert S. Aff., ¶ 10. According to Hilbert S., Aimee D. "said that [Walker] would call to warn her that she was coming for a home visit, and she'd better clean up." Id. Of course, the statements attributed to Aimee D. about her relationship with Walker are classic hearsay. See FED. R. EVID. 801. It is well settled that hearsay is insufficient to create a question of fact on summary judgment. See FED. R. CIV. P. 56 (requiring that supporting affidavits "be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence...."); Amnesty America, 361 F.3d at 131 & n. 12 (on summary judgment, court may

disregard hearsay in affidavits); <u>Santos v. Murdock</u>, 243 F.3d 681, 683 (2d Cir. 2001)("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.").

Without testimony from Aimee D. herself, and given Walker's denial of any untoward conduct involving herself and Aimee D., there is no admissible evidence to support Plaintiffs' theory that Walker used her position with DSS to create an opportunity for Aimee D. and Roland K. to inflict injury on the children. In the end, even drawing all reasonable inferences in favor of the Plaintiffs, Walker stands in the same position as Shelley and the municipal defendants.

As the Supreme Court explained in <u>DeShaney</u>:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [victims and their families] to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State ..., but by [the parent].

<u>DeShaney</u>, 489 U.S. at 202-03. While a more complete, or perhaps zealous, investigation by Walker might have avoided the harm to the children, the lack of such an investigation did not cause it. Rather, it was the children's mother and/or her paramour that injured these children, and while Walker and the other state actors may be responsible in negligence, a constitutional violation under the substantive due process clause has not been made out. <u>See</u> <u>Forrester</u>, 397 F.3d at 1059. The substantive due process claim against Walker is, therefore, dismissed.

**B. Procedural Due Process Claims**

Next, the Court turns to Plaintiffs' procedural due process claim. To assert a colorable procedural due process claim, a plaintiff must demonstrate that a state actor denied him or her of a

18

constitutionally protected interest in life, liberty, or property without due process of law.  See U.S.

Const., Amend. XIV.  However, "[i]n procedural due process claims, the deprivation by state action

of a constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional;

what is unconstitutional is the deprivation of such an interest without due process of the law."

Zinermon v. Burch, 494 U.S. 113, 125 (1990). "It is well settled that only a limited range of

interests fall within this provision."  Hewitt v. Helms, 459 U.S. 460, 466 (1983). "The requirements

of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth

Amendment's protection of liberty and property." Board of Regents v. Roth, 408 U.S. 564, 569

(1972).

  "In evaluating whether a state has created a protected interest in the administrative context,

we must determine whether the state statute or regulation at issue meaningfully channels official

discretion by mandating a defined administrative outcome." Sealed v. Sealed, 332 F.3d 51, 56 (2d

Cir. 2003). "[A] State creates a protected liberty interest by placing substantive limitations on

official discretion.... [generally] by establishing substantive predicates to govern official

decision-making, and, further, by mandating the outcome to be reached upon a finding that the

relevant criteria have been met." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 462 (1989)(internal

quotations and citations omitted).  "Similarly, to claim a protected property interest in a particular

administrative benefit or measure, an individual must have 'a legitimate claim of entitlement' in

receiving the benefit or measure, not merely 'a unilateral expectation' in a desired administrative

outcome." Sealed v. Sealed, 332 F.3d at 56 (quoting Roth, 408 U.S. at 577). In this regard, the

Supreme Court in Roth explained that "[p]roperty interests ... are not created by the Constitution.

19

Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577.

State child protection legislation, even with procedural requirements "for the immediate classification and evaluation of child abuse reports, the timely initiation of an investigation, and the conduct of the investigation," does not create protected property or liberty interests when the statutory scheme "invest significant discretion in the [child protective workers] to determine both whether an investigation is warranted and what remedial action, if any, to pursue based on the results of the investigation." Sealed v. Sealed, 332 F.3d at 57; see Teresa T. v. Ragaglia, 154 F. Supp.2d 290, 303-04 (D. Ct. 2001),[11] aff'd sub nom. Sealed v. Sealed, 125 Fed. Appx. 338, 2005 WL 481603 (2d Cir. 2005)(unpublished decision); Marisol A. v. Giuliani, 929 F. Supp. 662, 678 (S.D.N.Y. 1996)(discussing procedural due process cases brought under child protective legislation from various jurisdictions). Indeed, "[w]here the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment." Sealed, 332

---

[11] In dismissing the plaintiffs' procedural due process claim under Connecticut's child protection statutes, the District of Connecticut held in Teresa T:

> The plaintiffs' ... argument makes clear that the procedural rights they seek to enforce stem not from a constitutional source, but rather from Connecticut's state-created procedures. Procedures alone, however, do not demonstrate a legitimate claim of entitlement. The DeShaney court concluded that the states were under no obligation to protect children from the abuse of private actors. It would be inapposite to conclude that Connecticut's child protection statutes, and the procedures contained within, trigger procedural due process rights. "The State may choose to require procedures for reasons other than the protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." Olim v. Wakinekona, 461 U.S. 238, 250-51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

154 F. Supp.2d at 304.

F. 3d at 56 (emphasis in original).

Plaintiffs assert that "[u]nder New York Social Services Law § 411 *et seq.*, Art. 6, Title 6, the plaintiff children are entitled to protective services under state mandates regarding, *inter alia*, mandated reporting by mandated reporters ..., as well as mandated investigation and intervention protocols governing the conduct of the mandated child protective services unit of each County through its Department of Social Services." Id. at ¶ 78. Plaintiffs further allege that "Defendants' conduct deprived plaintiff children of mandated services to which they were entitled by statute, without due process of law ...." Compl. ¶ 83.

In Mark G. v. Sabol, 93 N.Y.2d 710 (1999), the New York Court of Appeals affirmed the dismissal of a similarly pled claim, finding that the plaintiffs did not have a viable procedural due process claim under New York's child protective legislation.[12]  The instant case, like Mark G.,

_____

[12] The plaintiffs in Mark G. were a group of children in foster care who asserted, *inter alia*, due process claims against DSS personnel because "defendants failed to accord them the protective services to which they were entitled under titles 4 and 6 of article 6 of the Social Services Law." Id. at 722-23.  The New York Court of Appeals held that under the statutory scheme in question, and given the nature of the plaintiffs' allegations, a procedural due process claim could not be made out. In this regard, the New York Court of Appeals held:

> In general, procedural due process claims challenge the procedures used by the government in effecting a deprivation of a right, whereas substantive due process claims challenge the action itself. Thus, substantive due process implicates the essence of state action rather than its modalities.  In one commentator's formulation, procedural due process differs from substantive due process by focusing not on what a person has been deprived of, but rather on how the deprivation was accomplished.

> The classic procedural due process case arises when the government acts to deny or curtail someone's life, liberty or property interest and defends its action by asserting that it employed fair procedures in furtherance of a legitimate governmental objective. That is not the case before us.

> Here, deprivation or denial is not the governmental goal. This case does not involve an attempt by the government to deprive the plaintiffs of a right that carries with it a predeprivation procedure.  The government may not decide to deny a foster child's safety or entitlements and seek to justify the denial by showing that its processes or procedures were fair.  No amount of procedure can justify the wrongful denial of an entitlement. Moreover, merely asserting a denial of a statutory entitlement does not make out a claim of procedural due process.  As the United States Supreme Court [has] held,

(continued...)

"does not involve an attempt by the government to deprive the plaintiffs of a right that carries with it a predeprivation procedure," Mark G., 93 N.Y. 2d at 723, and therefore there is no basis for a procedural due process claim.

Further, the essence of Plaintiffs' claim is addressed to the discretionary aspects of title 6 of article 6 of the Social Services Law and therefore does not create a property or liberty interest entitled to due process protection. See Sealed v. Sealed, 332 F.3d at 55-56. In this regard, Plaintiffs' grievance is, essentially, that Defendants failed to uncover and stop the abuse in children's home, and that this failure caused the children to suffer further harm from their mother and her paramour. See Compl. ¶ 1 ("This is an action to recover damages arising from sexual abuse, abuse, and neglect the infant plaintiffs sustained as a result of civil rights and statutory violations, negligence, and intentional conduct on the part of the [defendants.]"); Plt. "Suppl. Mem. L. Bearing on Claim of Procedural Due Process Violation," p. 1 ("This action arises from a five-year course of grossly inadequate child protective investigations on the part of defendant municipalities and municipal caseworkers, in response to reports of sexual abuse, abuse and neglect involving the plaintiff children."); fn. 7, *supra*. Plaintiffs argue that if certain investigative protocols were followed more stringently, the injuries to the children *might* have been avoided. Campbell Aff. ¶¶ 10, 25. Plaintiffs complaint is with the quality of the investigations and the nature of the conclusions reached by the caseworkers. See generally Campbell Aff.

---

[12](...continued)
process is not an end in itself. We conclude that plaintiffs have not adequately pleaded a violation of procedural due process, and that those causes of action should be dismissed.

Mark G., 93 N.Y. 2d at 723-24 (interior citations, quotation marks, and footnotes omitted).

However, as stated by the New York State Supreme Court, Appellate Division, First Department, in <u>Mark G.</u>, such a complaint is directed to discretionary aspects of New York's child protective legislation:

> Inherent in plaintiff's claim of entitlement to such preventive services is the implication that the statute imposes a nondiscretionary duty on the part of social services officials to make the statutorily required finding under certain described circumstances. <u>Such reasoning has already been rejected by this Court inasmuch as such professional evaluation as to the existence of a circumstance requiring child preventive services cannot reasonably be construed as ministerial or nondiscretionary. Any "entitlement" sought to be enforced depends upon the decisions of social services professionals and does not even come into existence until the discretionary determination as to what is appropriate has been made</u>.

<u>Mark G. v. Sabol</u>, 247 A.D.2d 15, 29 (1st Dept. 1998)(citations omitted)(emphasis added), <u>aff'd</u> 93 N.Y.2d 710.

To the extent that portions of the statue might mandate certain reporting, investigative, and case management protocols, <u>see</u> N.Y. Soc. Serv. Law §§ 413(1), 422, and 424; <u>Marisol A.</u>, 929 F. Supp. at 679-80, Plaintiffs' procedural due process claim nevertheless fails because the New York statutory scheme, like the Connecticut scheme examined in <u>Sealed v. Sealed</u>, invests significant discretion in the child protective workers to determine whether an investigation is warranted and what remedial action, if any, to pursue based on the results of the investigation. <u>See Sealed</u>, 332 F.3d at 57; N.Y. Soc. Serv. Law §§ 424(6),[13] 424(9), and [14] 424(10).[15]  The act of filing certain case

---

[13] New York Soc. Serv. Law  § 424(6) provides:

Each child protective service shall:

6. upon receipt of such report, commence ..., within twenty-four hours, <u>an appropriate investigation</u> which shall include <u>an evaluation of</u> the environment of the child named in the report and any other children in the same home and <u>a determination of the risk to</u> such children if they continue to remain in the existing home environment, as well as <u>a determination of the nature, extent and cause of any</u>

(continued...)

management reports, or even reporting information about child abuse to a court, police, or other

authorities, even if mandated by the statute, see N.Y. Soc. Serv. Law §§ 413 and 414, does not

yield a substantive outcome entitled to due process protection.  A.S. v. Tellus, 22 F. Supp.2d 1217,

1223 (D. Kan. 1998).

Even accepting Plaintiffs' weakly supported contention that Defendants ignored reports

transferred to the local DSS from the N.Y. Central Register,[16] Plaintiffs fail to point any provision

---

[13](...continued)
condition enumerated in such report and the name, age and condition of other children in the home,
and, after seeing to the safety of the child or children, forthwith notify the subjects of the report and
other persons named in the report in writing of the existence of the report and their respective rights
pursuant to this title in regard to amendment;

Id. (emphasis added).

[14] New York Soc. Serv. Law . § 424(9) provides:

Each child protective service shall:

(9) take a child into protective custody to protect him from further abuse or maltreatment when
appropriate and in accordance with the provisions of the family court act;

Id. (emphasis added).

[15] New York Soc. Serv. Law  § 424(10) provides:

Each child protective service shall:

10. based on the investigation and evaluation conducted pursuant to this title, offer to the family of any
child believed to be suffering from abuse or maltreatment such services for its acceptance or refusal,
as appear appropriate for either the child or the family or both;  provided, however, that prior to
offering such services to a family, explain that it has no legal authority to compel such family to
receive said services, but may inform the family of the obligations and authority of the child protective
service to petition the family court for a determination that a child is in need of care and protection;

Id. (emphasis added).

[16] Plaintiffs argue that "[m]any of the reports [of suspected abuse or maltreatment], especially those made by
the grandparents, were discredited without investigation." Pl. "Suppl. Mem. L. Bearing on Claim of Procedural Due
Process Violation," p.2.  However, despite artfully crafted language that gives the impression that Defendants ignored
Central Register reports, the evidence establishes that the referenced-complaints from the grandparents were not made to

(continued...)

of the statute that, under the circumstances, required the caseworkers to take specific substantive

action. See Sealed, 332 F.3d at 57. The mandate to conduct an immediate investigation "merely

*authorizes* particular actions and remedies," id. at 56,  but does not require a certain substantive

outcome.  Thus, to the extent that it could be concluded that Defendants failed to conduct an

investigation into particular reports as required by statute, see N.Y. Soc. Serv. Law § 424(6), the

Defendants' failure merely denied Plaintiffs the first step in the discretionary process.  Plaintiffs

were not deprived of an interest protected by the Procedural Due Process Clause. See  A.S., 22 F.

Supp.2d at 1223 ("[T]he statutory right to an investigation is not protected by the due process

clause" because the requirement to conduct an investigation "does not prescribe or guarantee a

particular substantive outcome.")(citing Olim v. Wakinekona, 461 U.S. 238, 249 (1983) and Doe by

Nelson v. Milwaukee County, 903 F.2d 499, 502 (7th Cir. 1990)).[17]

---

[16](...continued)
the N.Y. Central Register, but instead were made to caseworkers *after* investigations had already been commenced. See
Pl. Counter-Statement of Material Facts ¶ 36 (Contending that Hilbert S. made calls to DSS "during the investigation
and after the report was "indicated'"); ¶ 37 (Contending that Hilbert S. "made calls to DSS"  that "went nowhere," but
citing the CPS Investigative Summary for proof of such calls thereby indicating that  investigations were already
commenced at the time of the purported calls).

To the extent that the Plaintiffs rely upon the reports made by Tacoma Donahue, id. ¶ 40,  there is little
indication that the reports were made to the Central Register, and if they were, that the reports were accepted and
transmitted to the local DSS. See N.Y.S.S.L. § 422(2)(affording workers at the Central Register discretion to accept or
reject a call of purported abuse and maltreatment). Despite voluminous evidence regarding the other reports transmitted
to Defendants,  Plaintiffs have produced no evidence beyond Ms. Donahue's affidavit that her reports were made to the
Central Register, accepted, and transmitted to the defendant agency. Indeed, it is possible that Ms. Donahue's reports
were not accepted by the New York Central Register, and thus never transmitted to the local agency. Nonetheless,
because this is a motion for summary judgment,  the Court  will draw the conclusion that the reports were accepted and
transmitted to Defendants.

[17] Like the Kansas statutory scheme examined in A.S., the New York statutory scheme attempts to balance the
competing interests of protecting children from abuse and/or neglect, and the desire to maintain the child in the home if
appropriate under the circumstances.  See N.Y.S.S.L. § 424 (9)-(13); N.Y. Fam. Ct. Act § 1027(b)(i)(Before removing a
child, the Family Court considers whether the local social service agency made appropriate and reasonable efforts to
prevent or eliminate the need for removal). Thus, like under the Kansas statutory scheme, a requirement to conduct an

(continued...)

Given Plaintiffs' allegations, it cannot be said that they were denied constitutionally protected liberty or property rights under the statutory scheme in question. Sealed, 332 F.3d at 57; see Mark G., 93 N.Y. 2d at 723-24; Teresa T., 154 F. Supp.2d at 304. Accordingly, their procedural due process claims are dismissed.

### C.  CAPTA Claim

In the Fourth Cause of Action, Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 contending that they have been deprived of certain rights under the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 *et seq.* ("CAPTA"). See Compl. ¶¶ 85-93. Defendants argue that Plaintiffs have no private right under CAPTA and, therefore, argue that the claim should be dismissed.

The Child Abuse Prevention and Treatment Act is a federal funding statute that requires, *inter alia*, that states have a reporting system for allegations of child abuse or neglect; a system for prompt investigation of such allegations and for immediate action to protect children who are abused or neglected children or are in danger of abuse or neglect; and, procedures, personnel, facilities, programs, training and services to adequately address cases of child abuse and neglect. See 42 U.S.C. §§ 5106a(b)(1)(A), (2) and (3).  Plaintiffs contend that the Defendants "failed to abide by CAPTA's reporting, assessment, investigation, cooperation, training, and remediation requirements," Compl. ¶ 91, and thereby "effectively deprived plaintiff children of their rights under the terms of CAPTA." Id. ¶ 92.  The Court presumes that Plaintiffs assert that Defendants' conduct

---

[17](...continued)
investigation is far from mandating a particular outcome. See A.S., 22 F. Supp.2d at 1223.

violated CAPTA at §§ 5106a(b)(1)(A), (2) and (3). See Jordan v. City of Philadelphia, 66 F.

Supp.2d 638, 648 (E.D. Pa. 1999);[18] see Pl.'s Mem. L., p. 7 (referencing §§ 5106a(b)(2) and (3)).

Section 1983 imposes liability on anyone who, under color of state law, deprives a person

"of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  In

order to assert a viable Section 1983 claim for the violation of a federal statute, a plaintiff must

demonstrate the violation of a federal *right,* not merely a violation of federal law. Golden State

Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989); see Mark G., 247 A.D.2d at 18-27

("The principal issue presented is the effect of Federal funding statutes on State social services

programs and whether the acceptance by the States of such funding creates an individual right

enforceable pursuant to ... § 1983 for parties aggrieved by failures in such State programs."). The

Supreme Court "traditionally look[s] at three factors when determining whether a particular

statutory provision gives rise to a federal right." Blessing v. Freestone, 520 U.S. 329, 340 (1997).

"First, Congress must have intended that the provision in question benefit the plaintiff." Id. (citing

Wright v. City of Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 430 (1987)).

"Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so

---

[18] In Jordan, the Court wrote that "[a]lthough plaintiffs' complaint does not identify the specific provisions of CAPTA under which they seek redress, we can easily infer that their claims fall under §§ 5106a(b)(2) and (3)." 66 F. Supp.2d at 648.  In a footnote, the District Court wrote:

> In their complaint, plaintiffs allege that defendants deprived them of rights under CAPTA, including the right to prompt and appropriate investigation of reports of abuse or neglect, to protection from those who endanger their health and welfare, and to such administrative procedures, trained and qualified personnel, programs, and facilities that are necessary to deal effectively with child abuse and neglect in Philadelphia County (Pl's Compl. ¶ 120, Am. Compl. ¶ 123).  42 U.S.C. §§ 5106a(b)(2) and (3) include similar language, leading the court to believe that plaintiffs rely on these two provisions in their cause of action.

Id. at 648, n. 6.  In this instant case, Plaintiffs' allegations are substantially similar to the CAPTA allegations in Jordan.

'vague and amorphous' that its enforcement would strain judicial competence." Id. (citing Wright, 479 U.S. at 431-32). "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms." Id. (citing Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 510-11 (1990) and Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17 (1981)).

Every court that has considered the question since Blessing has concluded that there is no private right of action under CAPTA for the alleged failure of a social service agency to comply with the requirements of §§ 5106a(b)(1)(A), (2) and (3). See Mark G., 247 A.D.2d at 24;[19] Charles H. v. Whitman, 83 F. Supp. 2d 476, 496-97 (D. N.J. 2000);[20] Jordan v. City of Philadelphia, 66 F. Supp.2d 638, 648-49 (E.D. Pa. 1999);[21] A.S., 22 F. Supp.2d at 1224;[22] Jeanine B. by Blondis v. Thompson, 967 F. Supp. 1104, 1111-1119 (E.D. Wis. 1997).

Plaintiffs' reliance on Marisol A. is misplaced. That part of the Marisol A. decision directed

---

[19] In Mark G., the New York State Supreme Court, Appellate Division, held "[p]laintiffs' CAPTA claims pursuant to 42 U.S.C. § 5106a(b)(1)(A) and (b)(3) were properly dismissed ... because New York State has in place the required reporting provisions and because, under the third criterion of the Wilder test, the adequacy of the administration and operation of such laws is an area too vague and amorphous for judicial enforcement." 247 A.D.2d at 24. The same court further held that the plaintiffs' claim "pursuant to § 5106a(b)(2) in which they allege, inter alia, that defendants failed to promptly commence investigations upon receipt of reports of child abuse or neglect or that upon a finding of abuse or neglect, immediate protective steps were not taken relative to the subject child or other children under the same care," was also properly dismissed under prevailing law. Id.

[20] (Reviewing pre- and post-Blessing case law, and dismissing CAPTA claim on Rule 12(b)(6) motion on the grounds that "under Blessing, the right to 'prompt and professional investigations of allegations of abuse or neglect' and the right 'to protection from those who endanger their health and welfare' simply are too vague and amorphous as to be beyond the realm of judicial enforcement.").

[21] (Holding that "CAPTA clearly does not create a private right of action under 42 U.S.C. § 1983" because "CAPTA fails to mandate a particular means of investigation or state what type of actions must be taken to protect abused or neglected children," and therefore, such rights were "vague and amorphous.")

[22] (Agreeing with "the majority of courts" and holding that the requirements of 42 U.S.C. § 5106a(b)(2) "are too vague to create an enforceable right.")

to the CAPTA claim, decided before <u>Blessing</u>, has been rejected by those courts that have

considered it since <u>Blessing</u>. <u>See</u> <u>Mark G.</u>, 247 A.D.2d at 26 ("[W]hile the decision in <u>Marisol A.</u>

remains undisturbed at this time, its reasoning has been severely eroded."); <u>Charles H.</u>, 83 F. Supp.

2d at 497 ("In the face of th[e] support for the conclusion that 42 U.S.C. § 5106a(b)(2) does not

confer a private right enforceable under 42 U.S.C. § 1983, Plaintiffs' reliance on the reasoning of

<u>Marisol A.</u> [] is unconvincing."); <u>Jordan</u>, 66 F. Supp.2d at 648 (rejecting the holding of <u>Marisol A.</u>);

<u>A.S.</u>, 22 F. Supp.2d at 1224 (rejecting <u>Marisol A</u>). Further, as Plaintiffs' themselves point out,

<u>Marisol A.</u> was based upon a pre-amendment version of CAPTA that contained mandatory language

not contained in the current version of § 5601a. <u>See</u> Pl.'s Mem. L. p. 7 ("Although Congress has

made revisions to CAPTA since <u>Marisol A.</u> was decided, which has eliminated some of the

mandatory language of the former statute, <u>see</u>, 42 U.S.C. § 5601a, ...." ); <u>see</u> <u>Jeanine B.</u>, 967 F.

Supp. at 1111-1119 (examining the statute under <u>Blessing</u> both pre- and post-amendment).  That

amendment has essentially negated the applicability of <u>Marisol A.</u> on the issue of whether there is

an actionable right under CAPTA in situations such as the one at bar. <u>See</u> <u>Jeanine B.</u>, 967 F. Supp.

at 1119.[23]  Still further, as pointed out by the District of New Jersey in <u>Charles H.</u>, even before

<u>Blessing</u>, the weight of authority was that "42 U.S.C. § 5106a(b)(2) [did] not create a private right

---

[23] In  <u>Jeanine B.</u>, the District Court wrote that:

> [I]f the new statute applies, it represents a subsequent change in the controlling law which clearly
> warrants reconsideration of [the district court's prior decision finding an actionable CAPTA claim].
> Upon reconsideration, it is clear that plaintiffs' position is severely undercut by the new statute, and
> that the same either does not give rise to the rights claimed by the plaintiffs, or that said rights have not
> been violated by the defendants' conduct."

967 F. Supp. at 1119.

of action under § 1983." <u>Charles H.</u>, 83 F. Supp. 2d at 496.[24]

This Court agrees with the reasoning of those case that have held that CAPTA does not create clear and unambiguous obligations on the State that arise to the level of an enforceable right. Thus, under <u>Blessing</u>, Defendants are entitled to summary judgment dismissing Plaintiffs' CAPTA claim.

### D.  State Law Claims

The remainder of Plaintiffs' claims arise under state law and are asserted pursuant to this Court's supplemental jurisdiction. <u>See</u> 28 U.S.C. § 1367.  The exercise of jurisdiction over state law claims is discretionary once all federal claims have been dismissed. <u>Valencia v. Franco</u>, 316 F.3d 299, 305 (2d Cir. 2003); 28 U.S.C. § 1367(c).  However, this discretion is not "boundless." <u>Valencia</u>, 316 F. 3d at 305. This is because "[a] federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." <u>Carnegie-Mellon University v. Cohill</u>, 484 U.S. 343, 349-50 (1988)(citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725-29 (1966)).  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by

---

[24] (citing, <u>inter alia</u>, <u>Doe v. District of Columbia</u>, 93 F.3d 861, 868 (D.C. Cir. 1996)(holding that "Section 5106a(b)(2) of CAPTA fails to unambiguously confer an enforceable right upon its beneficiaries, therefore [plaintiff's] claim under § 1983 was appropriately rejected by the district court"); <u>Tony L. v. Childers</u>, 71 F.3d 1182, 1189 (6th Cir. 1995)(holding that "neither CAPTA nor the relevant regulations mandate a particular means of investigation or state what type of actions must be taken to protect abused or neglected children"), <u>cert. denied</u>, 517 U.S. (1996); <u>Baby Neal v. Ridge</u>, 1995 WL 728589, *5 (E.D. Pa. Dec. 7, 1995)(reaffirming its holding on reconsideration "that [CAPTA] does not give rise to an enforceable private right of action under 42 U.S.C. § 1983"); <u>Eric L. v. Bird</u>, 848 F. Supp. 303, 313 (D. N.H. 1994)(holding that CAPTA does not confer a right subject to private enforcement under § 1983 to have the state's child protection laws "effectively" enforced); <u>Baby Neal v. Casey</u>, 821 F. Supp. 320, 329 (E.D. Pa. 1993)(holding that CAPTA "does not create enforceable rights under 42 U.S.C. § 1983"); <u>Jensen v. Conrad</u>, 570 F. Supp. 91, 112-13 (D.S.C. 1983)(holding that CAPTA does not give plaintiff a "right to be unqualifiedly protected from, or free from, abuse within the contemplation of § 1983"), <u>aff'd</u>, 747 F.2d 185 (4th Cir.1984), <u>cert. denied</u>, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985)).

procuring for them a surer-footed reading of applicable law." <u>Gibbs</u>, 383 U.S. at 726.  Thus,

> in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims.

<u>Cohill</u>, 484 U.S. at 350 n. 7.  Even when the case if progressed beyond discovery and is ready for

trial, it may be an abuse of discretion to adjudicate claims that raise unsettled questions of state law

and that required a balancing of important policies of state government. <u>Valencia</u>, 316 F.3d 306.

Here, despite the fact that discovery has been completed and the case trial ready,

considerations of comity and respect for state adjudication of novel and unsettled state claims

dictate that this Court refrain from exercising supplemental jurisdiction over Plaintiffs' state law

claims.  These state claims raise novel issue that affect the important public policies in New York

governing child abuse and maltreatment investigations and the duties owed by child protective

departments and caseworkers to the children they are assigned to protect. These issues dictate that a

state court decide, in the first instance, Plaintiffs' state law claims. Therefore, Plaintiffs' state law

claims are dismissed without prejudice to refiling in state court.

### E.  Sealing of Papers in this Case

The Court recognizes the public's right of access to the proceedings and papers filed in this

case.  However, the papers filed in the action, including the depositions of the infant plaintiffs,

reveal intimate details about the sexual and physical abuse these children have been subjected to

during their lives.  The Court finds that the interest in protecting the privacy of these children, and

shielding them from undue embarrassment or ridicule, outweighs the right of access to the

unredacted documents filed in this action.  However, at this stage and given that the case will be

dismissed *en toto*, the interest of justice do not dictate that the entire file be re-created.  Instead, the Court orders that the entire file be sealed, save for this Decision and Order (which shall remain as a public document). Further, the Clerk of the Court is directed to amend the caption of this action on the official docket to comply with the caption used by the Court, above.  Should any member of the public petition for access for any documents in this file, and should the Court find that such access should be granted, counsel for the party that submitted the sought-after documents will be directed to file redacted versions of those documents.

## V.    CONCLUSION

For the reason set forth above, Defendants' motion for summary judgment is **GRANTED**. All federal claims are dismissed with prejudice, and all state law claims are dismissed without prejudice to refiling in state court.  The Clerk of the Court is directed to seal all of the documents in this file, except for this Decision and Order which shall remain a public document. Further, the Clerk of the Court shall amend the caption of the case on the docket sheet to reflect the caption used by the Court, above.


**IT IS SO ORDERED**

DATED:        June 21, 2005

Thomas J. McAvoy
Senior, U.S. District Judge